FILED
2012 Feb-17  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| RODERICK BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 7:10-cv-1170-LSC |
| | ) | |
| SUMTER COUNTY | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

### I. Introduction.

This case comes before the Court on the complaint of Plaintiff Roderick Brown against Defendant Sumter County Board of Education for failure to hire him as a full-time custodian. Brown claims that he was discriminated on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1981 & 1983.

Presently before the Court is the Board's motion for summary judgment, filed on October 07, 2011. (Doc. 18.) Brown filed a response in opposition on October 27, 2011 (Doc. 25-1), to which the Board replied on November 08, 2011. (Doc. 26.) The motion has now been fully briefed and is ripe for decision.

**II. Facts.**[1]

Roderick Brown ("Brown") began working as a substitute custodian for the Sumter County Board of Education ("the Board") in 2005. His goal was to be hired as a full-time custodian, and from 2005–09 he maintained an updated application on file with the Board.

During the 2005–06 school year, Brown worked as a substitute custodian at Livingston High School, alongside full-time custodians Ricky Travis and Mr. Cook.[2] The following year he worked full-time hours, but still in a substitute capacity, at the Kinterbish Junior High School. He was the only custodian there at the time.

Brown was then transferred to Livingston Junior High School, where he continued to work as a substitute custodian with full-time hours. From there he was transferred to North Sumter Junior High School. He then served at Bell-Brown Career Technical Center ("Bell-Brown") as the only custodian working full-time hours in the 2008–09 school year, nonetheless still classified as a substitute.

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). As emphasized in the Uniform Initial Order, all material facts set out in the moving party's motion which are not disputed in the response are "deemed to be admitted for summary judgment purposes." (Doc. 7 at 17.)

[2]"Mr. Cook" is referenced several times in the briefs and depositions, but no first name is given.

While Brown worked at Livingston High, alongside Ricky Travis, the principal—Eric Hines—developed a negative impression of Brown. Because Ricky Travis had a reputation for sleeping on the job, and Principal Hines observed Brown spending time with Ricky Travis, he assumed that Brown was similarly shirking his duties.

In 2008, an opening for full-time janitor became available at Livingston High. The qualifications for the position were a high school diploma or equivalent. The position was awarded to Lewis Speight, who did not have any prior custodial experience or work history with the Board.

Another opening was posted in 2009, this time for a full-time custodial position at Bell-Brown. The posted closing date for applications was June 2, 2009. Brown completed an application for the position on June 11, 2009. The Bell-Brown position was ultimately awarded to Curtis Goodwin, who was an acquaintance of Travis Bailey, the principal at Bell-Brown. Goodwin had previously worked for the Board as a school bus driver.

For both of these positions, recommendations were made by the school principal to the superintendant of the Board, Dr. Fred Primm. The Board then made hiring decisions based on the recommendations of Dr. Primm.

Brown alleges that he was wrongfully overlooked on three occasions: the full-time positions filled by Ricky Travis, Lewis Speight, and Curtis Goodwin. He contends that the Board refused to hire him because of his race or color. Brown describes himself as a black man with exceptionally dark skin, while the three men that were hired are black men with lighter skin. Brown filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 5, 2009, and filed the instant suit on May 4, 2010.

## III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its

case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.  Analysis.

The Board relies on three grounds in support of its motion for summary judgment. First, it argues that any Title VII claims arising before March 14, 2009, are barred by the statute of limitations. Second, it contends that Brown's claims fail, for multiple reasons, when analyzed under the *McDonnell Douglas* framework. Finally, the Board maintains that Brown's § 1983 claims fail as a matter of law because school

boards may not be held liable under a *respondeat superior* theory; instead, they require an official policy or custom in order for liability to attach.

### A. Untimeliness of Brown's Action.

In the context of Title VII claims, "discrete discriminatory acts are not actionable if time barred." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). In order to be timely, a charge of discrimination involving a discrete discriminatory act must be "filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The failure to promote, or refusal to hire, typically constitutes such a discrete discriminatory act. *See id.* at 114; *see also E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

Brown contends that the failure to hire him was not a discrete act; instead, he asserts that his claims are "continuous in nature, timely filed and not barred." (Doc. 25-1 at 10.) In support, Brown cites to *Buffington v. General Time Corp.*, a case from the Middle District of Georgia. 677 F. Supp. 1186, 1191 (M.D. Ga. 1988). Not only is *Buffington* not binding, but it does nothing to help Brown's position. The court in *Buffington* found that the plaintiff's continuous "denial of promotions over time" were enough to "bring her case within the 'continuing violation' doctrine." *Id.*

Brown's attempt to similarly categorize his own situation is unavailing. On the very page where Brown asserts that his claims are "continuous in nature," his brief calls attention—twice—to the reason why this is not the case. The brief states that "Roderick Brown applied *three times* for the same position between the years of 2006–2009," and also recounts how Brown "filed his EEOC charge on September 5, 2009, specifically stating that he applied for *three custodial positions*." (Doc. 25-1 at 9–10, emphases added.) A description in his complaint states even more explicitly that "Brown applied three (3) separate times." (Doc. 1 at 3.) The facts section of Brown's brief describes these three separate times as corresponding to the three positions awarded to "Lewis Speights, Ricky Travis and Curtis Goodwin." (Doc. 25-1 at 4.)

Brown's own repeated description of three distinct events is directly at odds with his attempt to paint these incidents as a continuous, ongoing pattern. Instead, Brown himself illustrates that these were "discrete, one-time employment events that should have put [him] on notice that a cause of action had accrued." *Joe's Stone Crabs*, 296 F.3d at 1272. As the Supreme Court noted in *Morgan*, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." 536 U.S. at 114. Although Brown apparently has no difficulty identifying these three occurrences on his own, he did not file his EEOC charge until September

5, 2009. Any Title VII claims which arose more than 180 days before that date (i.e., before March 14, 2009) are therefore untimely. As a result, only one of the three positions at issue—the 2009 position awarded to Curtis Goodwin at Bell-Brown—is timely under Title VII.

Of course, this limitation period applies only to Brown's Title VII claims, and does not apply to claims under § 1983, which has its own statute of limitations. Section 1983 actions in Alabama follow the state's two-year limitations period for tort actions, *see Powell v. Thomas*, 643 F.3d 1300, 1303 (11th Cir. 2011), and do not require exhaustion of administrative remedies. *See Smith v. McClammy*, 740 F.2d 925, 927 (11th Cir. 1984). The relevant date for § 1983 purposes is the date that suit was filed; in this case, May 4, 2010. (Doc. 1.) Any § 1983 claims which arose more than two years before this date are barred, while those that arose after that date are not. Thus, two of the hirings at issue are timely under § 1983—the 2009 position filled by Curtis Goodwin, and the 2008 position filled by Lewis Speight—while the 2005 position held by Ricky Travis is time-barred under both Title VII and § 1983.

**B. Brown's Discrimination Claims**.

Discrimination claims brought under §1981, § 1983, or Title VII "employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). That framework requires a plaintiff to demonstrate "that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999). A plaintiff may do so by using direct evidence of discrimination, or by using circumstantial evidence. *Id.* at 1293. Because Brown has offered no direct evidence of discrimination, the Court evaluates his claims using the *McDonnell Douglas* framework.[3]

To assist a plaintiff in demonstrating that an inherently subjective decision was nonetheless motivated by improper discrimination, *McDonnell Douglas Corp. v. Green* provides a burden-shifting paradigm designed to create a presumption of unlawful discrimination—or, at least, to provide the plaintiff objective, non-discriminatory reasons for an adverse employment action. 411 U.S. 792, 802 (1973). In the context of a failure to promote or refusal to hire case, a plaintiff must first put forward the following four elements of a prima facie case:

---

[3]Both parties acknowledge that *McDonnell Douglas* is the appropriate analysis here, although they obviously disagree about its application. (*See* Doc. 19 at 7, Doc. 25-1 at 13.)

> 1) [he] is a member of a protected class under Title VII;
> 2) [he] was qualified for the employment position in question; 3) [he] applied for the employment position in question and was rejected; and 4) the employment position remained open or was filled by a person outside the protected class to which the plaintiff belongs.

*Walker v. Mortham*, 158 F.3d 1177, 1180 n.2 (11th Cir. 1998). Once a prima facie case has been made out, "the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001). Finally, "[i]f such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Id.*

### 1. Brown's Prima Facie Case

The first two of the prima facie elements are easily dispensed with; there is no real dispute about Brown's status as the member of a protected class. Nor do the parties disagree that he was qualified for the positions in question. They do dispute, however, whether Brown has satisfied the third[4] and fourth elements.

---

[4]Brown states that the Board concedes the third element, which is only partially correct. The Board does not appear to dispute that Brown "was not hired despite his qualifications." (Doc 25-1 at 13.) It does contend, as discussed below, that Brown never properly *applied* for these positions.

### i. Third Prima Facie Element

With respect to the third prima facie element, that Brown "applied for the employment position in question and was rejected," *Walker*, 158 F.3d at 1180 n.2, the Board disputes the first half of this requirement—Brown's application, not his rejection. The Board contends that this element is lacking for two of the three positions at issue. Regarding the first position, held by Ricky Travis, the Board points out that the position was not even vacant; Ricky Travis was working as a full-time custodian at the time that Brown first became a substitute custodian. (Doc. 19 ¶ 13.) While Brown responds to this assertion by stating that he kept "an active, updated application on file" during this time, to be considered "if Ricky Travis were to leave," he does not deny that the position was not actually vacant. (Doc. 25-1 ¶ 13.) Despite Brown's hedging on this point in the facts section of his brief, his deposition testimony is abundantly clear:

> Q.   Okay. So you did not apply for the position that [Ricky Travis] held; correct?
>
> A.   Huh-uh. No.
>
>  . . . .
>
> Q.   Okay. Okay. So he was already working as a full-time custodian, and you did not apply for a position that he filled?

> A.    No. No, ma'am.
>
> . . . .
>
> Q.    Because he was already working in his full-time custodial position when you started as a substitute?
>
> A.    Right. See, they trained me. See, they trained me.

(Doc. 23-1 at 24.) It is evident from the record that Brown never applied for Ricky Travis' position, for the simple reason that there was no vacancy there to be filled. Brown has failed to produce any evidence to the contrary. As such, he fails to meet the third prima facie element for the position held by Travis.

The Board challenges the third prima facie element as it applies to the position held by Curtis Goodwin as well. Goodwin was hired as the full-time custodian at Bell-Brown for the 2009–10 school year. The application deadline for this position was June 2, 2009.[5] (Doc. 23-1 at 69.) Brown did submit an application for the job, but did so over a week late, on June 11, 2009. As of the deadline, only one person—Curtis Goodwin—had submitted an application for it. (Doc. 25-1 at 5.) Brown contends that a separate application from him was unnecessary, as he already kept a detailed application on file which should have sufficed on its own. But not only is this called

---

[5]The job posting does state that applications or résumés would be accepted "later if the positions have not been filled." (Doc. 23-1 at 69.) As of the application deadline, however, Goodwin had been interviewed and recommended for the position. (Doc 23-8 at 38.)

into question by the fact that he *did* complete an application, albeit late, the uncontroverted testimony of Travis Bailey is that applications could be kept on file at the central office (Doc. 23-2 at 5), but a separate letter of interest would be needed in order to be considered for a particular job. (Doc. 23-2 at 27.) This is also bolstered by the application of Mr. Goodwin himself, which appears to be a one-page, hand-written note that simply says "I am applying for the janitor position at Bell Brown Vocational Center." (Doc. 23-3 at 36.) Brown submitted nothing of the kind until well after the deadline was past. Because there appears to be no real question about whether Brown submitted a timely  application for the Goodwin position, he fails to meet the third prima facie element here as well. The Board does not contest, however, the third prima facie element for the 2008 position that was filled by Lewis Speight.

## ii. Fourth Prima Facie Element

Assuming arguendo that the third element is satisfied, the fourth prima facie element requires a showing that the position was "filled by a person outside the protected class to which the plaintiff belongs." *Walker*, 158 F.3d at 1180 n.2. Here, it is helpful to address the two bases for discrimination alleged by Brown—race and color[6]—independently of each other.

---

[6]From the time the complaint was filed, Brown's categorization of the basis of his suit has varied. The complaint first alleges that the Board denied him employment "on the basis of individuous [sic]

To the extent that Brown seeks to state a claim based on race, he plainly cannot satisfy the fourth element of his prima facie case. By his own accounting, he shares the same race as the three men whose positions he claims to have been passed over for. Brown describes himself as "a black male." (Doc. 25-1 at 12.) According to Brown, all three of the men that were selected to fill the positions instead of him likewise "were black males." (Doc. 25-1 at 3.)

Discrimination based on color is a different story. As even the Board acknowledges, discrimination based on color is an independently cognizable basis for a discrimination claim. Title VII explicitly prohibits discrimination in employment based on an "individual's race, *color*, religion, sex, or national origin." 42. U.S.C. § 2000e-2(a)(1) (emphasis added). Although the terms "race" and "color"have, at times, been used without distinction, this Court agrees with other courts in finding that "when Congress and the Supreme Court refer to race and color in the same phrase, that 'race' is to mean 'race,' and 'color' is to mean 'color.'" *Walker v. Secretary of Treasury*, 713 F.Supp. 403, 406 (N.D. Ga. 1989).

---

discrimination and colorism." (Doc. 1 ¶ 2.) The complaint also describes the reason as "ethnicity and race" (Doc. 1 ¶ 3), and also as "race, color discrimination." (Doc. 1 ¶ 18.) The complaint actually only contains one claim, which it describes simply as "Racial Discrimination."(Doc. 1 at 5.) The response brief, however, emphasizes that this is an "action of discrimination based upon race *and* color." (Doc. 25-1 at 11.)

Brown contends that he possesses "exceptionally dark skin pigmentation." (Doc. 25-1 at 12.) He describes the men who were hired, as well as Travis Bailey, as "light skinned African Americans." (Doc. 23-1 at 31.) The Board attempts to cast doubt on Brown's testimony by showing that Brown can only speculate as to the reasons for the Board's hiring decisions, and that Brown himself has expressed doubt as to the actual reasons. (Doc. 19 at 11.) While the Board's objections on this point may be relevant to later steps in the analysis, the Board itself admits that "[p]resenting a prima facie case requires only that the plaintiff establish facts adequate to permit an inference of discrimination." (Doc. 18 at 4, citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). It is not the role of the Court, especially at the summary judgment stage, to engage in "the unsavory business of measuring skin color and determining whether the skin pigmentation of the parties is sufficiently different." *Sere v. Bd of Trustees*, 628 F. Supp. 1543, 1546 (N.D. Ill. 1986). The question of whether the fourth prima facie element is met is a question of fact, with enough support in the record for a reasonable jury to agree with Brown's characterization of the difference in skin color. The Court therefore deems the fourth prima facie element to be satisfied for summary judgment purposes.

## 2. Legitimate, Non-Discriminatory Reasons

Once a plaintiff has established a prima facie case,[7] the employer then has to produce evidence of a legitimate, non-discriminatory reason for the hiring decision. *Denney*, 247 F.3d at 1183. The employer's burden at this stage is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). If the employer articulates one or more such reasons, even if it does not "persuade the court that it was actually motivated by the proferred reasons . . . then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Brown v. Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (internal quotes omitted).

The Board offers multiple reasons for its decision not to hire Brown as full-time custodian. First, and most obvious, is Brown's failure to timely apply for the 2005 position and the 2009 position. While it has already been discussed as negating the third prima facie element, the failure to apply for a position certainly also serves as a legitimate, non-discriminatory reason for not hiring someone.

---

[7]The Court notes that Brown has only made out a prima facie case for one of the three incidents at issue, in 2008. For the sake of completeness, however, the following analysis applies to all three incidents.

Additionally, the Board points to "job performance problems, including leaving the campus without permission and failure to follow instructions" as grounds for the Board's decision not to hire Brown. Although the Board does not maintain performance records on substitute custodians (Doc. 23-2 at 5), the Principal of Bell-Brown, Travis Bailey, testified to several instances of Brown's poor performance as a substitute custodian there. Mr Bailey claims that Brown disturbed class on several occasions by using the lawnmower, weed eater, or blower near the classroom, even though he had been instructed "many times" to not do so while class was in session. (Doc. 23-2 at 24.) Bailey also claims that Brown was often late in the morning, would fail to properly check in, and would frequently leave the school campus without permission. (Doc. 23-2 at 15.) Brown once even raised the flag upside down, prompting people to ask the administration about the reason for a distress signal. (Doc. 23-2 at 24.)

If this were not already enough, Brown assists the Board in meeting its burden here by articulating an additional legitimate, non-discriminatory reason of his own. In Brown's response brief, he alleges that he was not considered for full-time position by Principal Hines, at Livingston High School, because "Hines was under the false impression that Brown was not performing his duties" on account of his association with Ricky Travis. (Doc. 25-1 at 4.) While Brown protests that Hines was mistaken,

what is relevant is simply that Hines *believed it to be so*, something which Brown does not dispute. An employer's good-faith mistaken belief in the misconduct of an employee is sufficient to meet the employer's burden at this step in the analysis, whether the employee is guilty of the misconduct or not. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991), *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race'. . . ."). The Board has therefore met its burden of producing legitimate, non-discriminatory reasons for not hiring Brown.

### 3. Demonstration of Pretext

After an employer has produced a legitimate, non-discriminatory reason, which the Board has done for each of the positions in question, then the "inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1273 (quoting *Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)). Brown argues that pretext is demonstrated by four pieces of evidence. (Doc. 25-1 at 14.) He claims that (1) Brown updated his application annually, (2) Travis Bailey and Fred Primm testified to the sufficiency of such annually-updated applications, (3) Brown was not aware of any performance issues while working at

Bell-Brown, and (4) Travis Bailey could not recall specific dates or provide documents to demonstrate Brown's poor performance. (Doc. 25-1 at 14–15.) The Court will address each point in turn.

In support of its first point, Brown cites to a section of his deposition, in which he states that he "always update[d] his application every year," and refers to a version of his application that was updated on June 26, 2009. (Doc. 23-1 at 25.) Although this copy of his application post-dates the events at issue, the Board does not dispute that Brown updated his application annually in previous years. Even if they did, the Court would be required to accept Brown's testimony as true for present purposes. Its relevance, however, is conditioned on Brown's second point.

Brown's second point is that "Travis Bailey and Fred Primm testified that applications updated annually with the central office are considered those having applied." (Doc. 25-1 at 14.) The Court takes this to mean that if a person maintains an annually-updated, on-file application, no further application from that person is required in order for them to be considered for openings that arise. In other words, Brown argues that because he kept his application up to date, he should automatically have been considered for any available openings, including the full-time position at Bell-Brown, and he says that this practice is substantiated by the testimony of principal Travis Bailey and superintendent Fred Primm.

In support, Brown relies on two sections of their depositions. The sections referred to, however, do not support Brown's argument. The cited section of Travis Bailey's deposition concerns the forwarding of applications to him from the central office, but says nothing about annually-updated applications, much less that they eliminate the need for an opening-specific application. (Doc. 23-2 at 5.) The cited portion of Dr. Primm's testimony provides even less support for Brown's point:

> Q.   Okay. So is it necessary to complete an application in all cases then?
>
> A.   For the—for just a general—just for general demographics or for specific jobs?
>
> Q.   For the specific opening at the school site.
>
> A.   For the specific job at the school site, they have to give the principal something in writing *specifically stating that that's the position that they would like to apply for*.
>
>   . . . .
>
> Q.   Okay. But candidates do not have to complete one at the school site?
>
> A.   They don't necessarily have to fill that out at the school site, no—
>
> Q.   Okay.
>
> A.   —if that's what you're asking me.

(Doc. 23-3 at 13, emphasis added.) While Primm acknowledges that an application does not have to be *completed at* the school site—consistent with Bailey's testimony that applications sent to the central office would be forwarded—Primm is clear in stating that an opening-specific application of some kind *is* required. As Brown points out, the Court is only required to consider factual materials which have been referred to by citation,[8] and the only citations given for this point serve to disprove the very point that they are cited for. But a broader survey of the factual record is likewise unavailing for Brown; other portions of the testimony also contradict his point:

> Q.    Okay. But what I'm saying is the applicant, even if they went to the central office or they *have an application at the central office*, they still have to give you a letter of interest—
>
> A.    Letter—
>
> Q.    —identifying their desire for that *specific position*?
>
> A.    That is correct. That is correct. Need a letter of interest.

---

[8]In Brown's own language, "the Federal Rule of Civil Procedure only require the court to consider factual materials to which it has been *properly* referred to by citation." (Doc. 25 at 3, emphasis added.) The Court notes that actually *none* of Brown's factual materials have been "properly" referred to by citation; all use an incorrect exhibit and/or page number. Some of Brown's citations to cases are also incorrect, such as his reference to *Busby v. City of Orlando*, which is cited as "913 F.2d 764" instead of "931 F.2d 764." (Doc. 25-1 at 15.) Nevertheless, the Court has endeavored to decipher all of Brown's citations, and all references here are to the official court docket numbers.

(Doc. 23-2 at 27, emphases added.) Brown's contention—that his annually-updated application was alone sufficient for consideration for the Bell-Brown position—appears to be completely unsupported by the testimony. It is also contradicted by his own actions, since he did in fact submit a separate application on June 11, after the application deadline had passed. As such, Brown cannot use this supposed practice to demonstrate pretext on the part of the Board.

Brown's third fact is that he himself was not aware of any performance issues while working at Bell-Brown. (Doc. 25-1 at 14.) As previously discussed, however, the relevance of his alleged misconduct is that those responsible for the hiring decision *believed* that his performance had been lacking. The Court takes Brown's testimony regarding his own knowledge to be true, but it is completely beside the point, since "the pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332–33 (11th Cir. 1998).

Similarly, Brown's fourth point is that Bailey did not have documents demonstrating Brown's poor performance and could not point to specific dates on which the alleged events took place. (Doc. 25-1 at 14–15.) Principal Bailey did, however, describe several instances of poor performance and said that they occurred "many times, many times." (Doc. 23-2 at 24.) But the uncontroverted evidence is that

no disciplinary records are kept for substitute custodians (Doc. 23-2 at 5), so the lack of specific dates or documents provides no evidence of pretext by itself.

Brown has done nothing to show that the Board's perception of his performance as poor was anything but sincerely held. Indeed, he highlights aspects of it, on the part of Principal Hines, which even the Board did not raise. (Doc. 25-1 at 4.) As such, Brown's four attempts at demonstrating pretext completely fail. No reasonable jury could conclude, from the evidence (or lack or evidence) presented, that the Board's non-discriminatory reasons for not hiring Brown were merely pretextual. Nor can evidence from the record as a whole be mustered to support such a finding. Brown admits that no one ever said anything which suggested the decision was based on race or color. (Doc. 23-1 at 33.) In fact, his own testimony is replete with alternative explanations for the Board's failure to hire him; he speculates that it may have been because they thought he was ugly (Doc. 23-1 at 31), because he "didn't have enough money," (Doc. 23-1 at 31), because "they hired the[ir] buddies," (Doc. 23-1 at 28), or they simply "didn't like [him], or they liked some body else." (Doc. 23-1 at 29).The lack of any evidence of pretext is illustrated by Brown's own testimony:

> Q.     . . . You just told me they've discriminated against you because they like—they didn't like you or they liked somebody else.
>
> A.     Right.

Q.    But not because you are a black man or an African-
American male.

A.    Well, that might have something to do with it.

Q.    It might have?

A.    Yes.

Q.    Okay. Well, tell me how.

A.    Well, I can't answer that.

(Doc. 23-1 at 29.) When pressed further for any evidence of discrimination, Brown responded, "They didn't hire me. They hired folks over me." (*Id.*) The Court has been unable to discover any evidence of discrimination beyond this naked fact. Because Brown cannot rebut the legitimate, non-discriminatory reasons given by the Board, his claims are due to be dismissed.

## V. Conclusion.

Brown claims that he was discriminated against, in violation of Title VII and § 1983, because of three instances in which he was not hired as a full-time custodian with the Sumter County Board of Education. For the reasons discussed above, summary judgment is due to be granted with regard to all three. Brown's claims relating to the first instance, the position held by Ricky Travis, is barred for several reasons: it is untimely under both Title VII and § 1983, Brown cannot make out a

prima facie case under *McDonnell Douglas*, and he cannot rebut the Board's legitimate, non-discriminatory reasons for not hiring him. The second position, filled by Lewis Speight, is untimely under Title VII, and even though Brown makes a prima facie case on a color-discrimination theory, he still cannot rebut any of the Board's legitimate, non-discriminatory reasons. The third instance, the position filled by Curtis Goodwin, *is* timely under both Title VII and § 1983, but still fails because Brown cannot make out a prima facie case and cannot show that the Board's reasons for not hiring him are pretextual.

Because there are already multiple reasons for granting summary judgment, the Court finds it unnecessary to decide the Board's third argument, that Brown's § 1983 claims fail as a matter of law because they are based on a *respondeat superior* theory. For the reasons stated, the Court will GRANT Defendant's motion for summary judgment. A separate order consistent with this opinion will be entered.

Done this <u>17th</u> day of <u>February, 2012</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]